**REED et al. v. COUNTY COM'RS OF DELA-WARE COUNTY, PA., et al.***

District Court, E. D. Pennsylvania. July 12, 1927.

No. 4017.

1. **Courts ⬅═265—Writ of mandamus may be granted by federal court only as auxiliary to other remedies.**

The writ of mandamus may be issued by a federal court as auxiliary to the jurisdiction conferred by Congress under the Constitution, but not as an independent remedy.

2. **Injunction ⬅═89—Courts may grant injunctions for the public good, within the judicial power.**

The general government has the right to the aid of its courts in enforcing measures for the general good, by injunctive remedy to promote the public interest and prevent injury to the public welfare, but only in matters within judicial cognizance.

3. **United States ⬅═23—Congress possesses such auxiliary powers as are necessary and appropriate to make express powers effective, including right of inquiries through committees.**

In order to carry out constitutional powers and duties imposed on Senate in judging election, returns, and qualifications of its members, both Houses of Congress, in their special relations, possess not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers, such as the power of inquiry through committees, as are necessary and appropriate to make the express powers effective.

4. **Constitutional law ⬅═67—Court held without jurisdiction to determine life of Senate committee, since it cannot be required to render an unenforceable decision (Const. art. I, § 5, subd. 2; Judicial Code, § 24 [Comp. St. § 991]).**

Under Const. art. 1, § 5, subd. 2, providing that each House of Congress "may determine the rules of its proceedings," whether the powers of a particular special committee of the Senate, under its rules and practice, continue after expiration of the Congress at which the committee was appointed; can only be determined by the Senate itself, and does not present a judicial question, within the jurisdiction of a federal court, under Judicial Code, § 24 (Comp. St. § 991), since the court cannot be required to render a decision which it may not enforce, but which is reviewable and reversible by either the executive or legislative departments.

In Equity. In the matter of the investigation by the United States Senate of the general election held November 2, 1926, at which a Senator for the state of Pennsylvania was elected. Suit by James A. Reed and others against the County Commissioners of Delaware County, Pa., and others. On motion to dismiss. Granted.

A. B. Geary, of Chester, Pa., and Jerry C. South and William H. King, both of Washington, D. C., for petitioners.

*Decree affirmed 21 F.(2d) 1018.

A. J. Williams, of Media, Pa., and John E. McDonough, of Chester, Pa., opposed.

THOMPSON, District Judge. On March 26, 1927, Jerry C. South, as the attorney and representative of a special committee of the United States Senate, claiming to act under Senate Resolutions 195 and 324 of the Sixty-Ninth Congress, brought suit by petition against the county commissioners of Delaware county, the prothonotary of Delaware county, and a justice of the peace for Delaware county, who are the custodians, under the law of Pennsylvania, of ballot boxes, ballots, return sheets, tallysheets, voters' lists, voters' check lists, ballot check lists, and registration lists, hereinafter for brevity referred to as the ballot boxes, employed and used in the said county at the general election on November 2, 1926, praying that process issue requiring the respondents to show cause why they should not deliver to him, as agent and representative, all ballot boxes used in Delaware county at the said election, to be by him delivered to the special committee of the Senate for their use in an investigation pending before them. An amended petition was subsequently filed, adding as petitioners Senators James A. Reed, Charles L. McNary, William H. King, and Robert M. La Follette, Jr., alleging that they constitute such special committee, acting under authority of the said resolutions.

Senate Resolution 195, agreed to by the Senate on May 19, 1926, authorizes the President of the Senate to appoint a special select committee to make investigation into the means used to influence the nomination of any person as a candidate for membership of the United States Senate.

"Said committee is hereby empowered to sit and act at such time or times and at such place or places as it may deem necessary, to require by subpœna or otherwise the attendance of witnesses, the production of books, papers, and documents, and to do such other acts as may be necessary in the matter of said investigation.

"The chairman of the committee or any member thereof may administer oaths to witnesses. Every person who, having been summoned as a witness by authority of said committee willfully makes default, or who, having appeared, refuses to answer any question pertinent to the investigation heretofore authorized, shall be held to the penalties provided by section 102 of the Revised Statutes of the United States.

"Said committee shall promptly report to the Senate the facts by it ascertained."

The Senators above named and Senator Goff of West Virginia were appointed members of the committee authorized under the said resolution. Subsequently Senator Goff resigned from the committee, and the four Senators above named continued to act.

After the November election in 1926 in Pennsylvania, at which William S. Vare and William P. Wilson were opposing candidates for a seat in the United States Senate, and William S. Vare was declared duly elected, Mr. Wilson presented his petition to the Senate, contesting the election of Mr. Vare, and on January 11, 1927, the Senate agreed to a resolution authorizing the select committee on investigation of expenditures in senatorial primaries and elections to take and preserve evidence in connection with the election of a Senator from Pennsylvania on November 2, 1926, being Senate Resolution 324.

"(1) To take possession in the presence of the said William S. Vare or his representative if the said William S. Vare desires to be present or to have a representative present, and preserve all ballot boxes and other containers of ballots, ballots, return sheets, voters' check lists, tally sheets, registration lists and other records, books and documents used in said senatorial election held in the state of Pennsylvania on the 2d day of November, 1926.

"(2) To take and preserve all evidence as to the various matters alleged in said petition, including any alleged fraud, irregularity, unlawful expenditure of money, and intimidation of voters or other acts or facts affecting the result of said election.

"(3) That said committee is hereby vested with all powers of procedure with respect to the subject-matter of this resolution that said committee possesses under resolution numbered 195, Sixty-Ninth Congress, first session, with respect to the subject-matter of that resolution.

"(4) That the sergeant at arms of the Senate and his deputies are directed to attend the said special committee and to execute its directions. That the said special committee may appoint subcommittees of one or more members with power and authority to act for the full committee in taking possession of evidence and in the subpœnaing of witnesses and taking testimony."

Thereafter, on February 17, Senator Reed, chairman of the committee created under Resolution 195, and having further authority conferred upon it by Resolution 324, submitted Senate Resolution 364, which is as follows:

"Resolved, that Senate Resolutions numbered 195, 227, and 258 of the Sixty-Ninth Congress, first session, and Senate Resolution numbered 324 of the Sixty-Ninth Congress, second session, be, and they hereby are, continued in force during the interim between the Sixty-Ninth Congress and the Seventieth Congress and thereafter until the 30th day of December, 1927.

"That the special committee created pursuant to Senate Resolution numbered 195 of the Sixty-Ninth Congress, first session, is authorized in its discretion, and/or at the request of either William S. Vare or William B. Wilson, to open any or all ballot boxes and examine and tabulate any or all ballots and scrutinize all books, papers, and documents which are now in its possession, or any that shall come into its possession, concerning the general election held in the state of Pennsylvania on the 2d day of November, 1926."

The resolution was ordered to the calendar, but failed of being voted upon for adoption before the adjournment of Congress on March 4.

It is alleged in the petition that on March 19, 1927, the committee appointed Mr. South as its representative and attorney to take into his possession and seal all ballot boxes used at the said election, and to securely keep them in some convenient place in the city of Washington for the use of the special committee authorized under Resolution 324 to investigate the said election; that the respondents, upon demand, refused to deliver any part of the ballot boxes demanded.

While the proceeding was commenced by petition, and not by bill, although the petitioners are seeking an equitable remedy by mandatory injunction, no objections have been raised to the failure on the part of the petitioners to conform to the equity practice, and the informality of their pleading and of the process issued may be regarded as waived.

The several respondents answered, denying the jurisdiction of the court, denying that the petition sets forth any ground for equitable relief, and denying the authority of the committee to vest in Mr. South the right and power to demand and take into his possession the ballot boxes and other election paraphernalia specified. The answer denies the authority of the committee to act, upon the ground that the life of the committee ceased at the end of the Sixty-Ninth Congress on March 4, 1927; that the subject-matter of Resolution 324 was superseded as the result of the action of Senator Robinson of Arkansas, who, during the clos-

ing days of the session, presented Mr. Wilson's petition of contest to the Senate and requested that it be received, printed in the Record, and referred to the committee on privileges and elections, a standing committee of the Senate under its rules, whereupon the Vice President announced that "without objection the petition will be received, printed in the Record, and referred to the committee on privileges and elections."

Without objection on the part of the petitioners, the petition of James F. Woodward to intervene as a party respondent, was granted. He intervened as a citizen and taxpayer, and, upon the ground that he had a state-wide interest in the ballots cast at the November election, for the reason that his name appeared upon every ballot for the office of secretary of internal affairs and that he has been returned as elected to that office. As Mr. Woodward was inducted into office on the first Monday of May, 1927, and the period for contesting his election under the laws of Pennsylvania has expired, he has no further interest, except as a citizen and taxpayer.

Motions to dismiss on the ground of want of jurisdiction were filed by all of the respondents, setting up substantially the same grounds of objection to the proceedings as set up in the answers. The petitioners contend that the court has jurisdiction under section 24 of the Judicial Code, which reads as follows:

"Section 24. The District Courts shall have original jurisdiction as follows: * * * "First. Of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof, authorized by law to sue."

Comp. St. § 991.

[1] It is frankly conceded that the petitioners cannot hope for the relief prayed for by mandamus. The writ of mandamus may issue as auxiliary to the exercise of jurisdiction conferred under the Constitution by Congress, but not as an exercise of original jurisdiction. See Riggs v. Johnson County, 6 Wall. 166, 18 L. Ed. 768; Lower v. United States, 91 U. S. 537, 23 L. Ed. 420. In re Massachusetts, 197 U. S. 482, 25 S. Ct. 512, 49 L. Ed. 845. Knapp v. Lake Shore & M. S. R. Co., 197 U. S. 536, 25 S. Ct. 538, 49 L. Ed. 870.

[2] The petitioners contend, however, that the present suit is a suit in equity, and that the court has jurisdiction upon the broad ground that jurisdiction in equity may be based upon the duty of the federal courts to render assistance to the national government by appropriate remedy in its exercise of a sovereign power, or in the discharge of a sovereign duty vested in or imposed upon it by the Constitution, expressly or impliedly. The reasoning upon which the claim is predicated is as follows:

The Senate, under the Constitution (article 1, § 5), has vested in it power to be the judge of the elections, returns, and qualifications of its own members, and, under article 1, § 4, has the power to legislate in conjunction with the House of Representatives upon the time and manner of holding senatorial elections. Through the exercise by the Senate of these sovereign powers vested in it, the federal government is enabled to prevent injury to the welfare of its citizens in Pennsylvania and elsewhere, arising from the improper conduct of senatorial elections, and to secure to its citizens their common right of being represented by Senators of their choice. They cite as authority for that power vested in, and that duty imposed upon, them as representing the federal government, the language of the Supreme Court in Re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092, where the Supreme Court sustained an injunction granted by the Circuit Court restraining officers of a labor organization from obstructing or interfering with interstate commerce. The language cited is as follows:

"Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court." Page 584 (15 S. Ct. 906).

" * * * Whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties." Page 586 (15 S. Ct. 907).

This broad doctrine of the right of the government as parens patriæ, in promoting the interest of the public, to have the assistance of its courts by injunctive remedy to promote the public interest and prevent injury to public welfare is sustained by ample authority cited by the petitioners. United States v. San Jacinto Tin Co. (1888) 125 U. S. 273, 285, 8 S. Ct. 850, 31 L. Ed. 747; United States v. American Bell Telephone Co. (1888) 128 U. S. 315, 367, 9 S. Ct. 90, 32 L. Ed. 450; United States v. Rickert (1903) 188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 532; Heckman v. United States (1912) 224 U. S. 413, 438, 442, 32 S. Ct. 424, 56 L. Ed. 820, affirming United States v. Allen (C. C. A. 8th Cir. 1910) 179 F. 13, 16, 17, per Amidon, J; Sanitary District v. United States (1925) 266 U. S. 405, 425, 426, 45 S. Ct. 176, 69 L. Ed. 352.

[3] And, in order to carry out the constitutional powers and duties imposed upon the Senate in judging the election, returns, and qualifications of its members, it is settled authoritatively that the two Houses of Congress, in their special relations, possess, not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective. Among these auxiliary powers is the power of inquiry, and, in its discretion, to conduct such inquiries through committees. McGrain v. Daugherty, 273 U. S. 135, 47 S. Ct. 319, 71 L. Ed. 580.

It is not denied by the respondents that the Senate, as such, or a committee duly acting under authority of the Senate, has these rights and powers auxiliary to those expressly granted by the Constitution or by law necessary to perform its constitutional functions, nor is it contended that it is not appropriate and necessary that, in view of the contest by Mr. Wilson, the Senate shall proceed to inquire whether he, the contestant, or Mr. Vare, the claimant, has been duly elected by a majority of the lawful votes cast, and that the Senate should, in the exercise of its judgment, determine that question. What the respondents do contend is that the petitioners do not constitute a committee of the Senate, with power to make the inquiry and for that purpose to take into its possession the ballot boxes, for the reason that, while the Senate is a continuing body, and although one-third of its members go out of office at the expiration of each Congress, the remaining two-thirds still constitute the Senate, and it concededly has power to continue its committees under its practice or its resolutions,

yet, under its practice and rules, a special or select committee, such as may be appointed in the manner the petitioners were, does not continue in power and authority after the end of the session, and hence the committee created under Resolution 195, and having its powers extended by Resolution 324, ended its existence on March 4, when the Senate adjourned.

It is contended by the respondents that the practice of the Senate, as shown by the evidence, has been to continue special committees only by resolution, specifying their continuance after an adjournment or during a recess of Congress, or into and through a later session. In order to establish this practice, resolutions of the Senate have been offered in evidence, which show that, from the close of the Fifty-First Congress in 1891, down to and including the Sixty-Second Congress, with the exception of the Fifty-Second Congress, standing and select committees have been continued by blanket resolution during the closing days of the session; that from the Sixty-Third Congress to the close of the Sixty-Sixth Congress standing committees alone were continued by general resolutions; that by rule XXV of the Standing Rules of the Senate, as amended and adopted on April 28, 1921, it is provided that all standing committees shall continue and have power to act until their successors are appointed. It is also shown by resolutions offered in evidence that, in providing for the appointment of special committees by resolution, the life of the committee is provided for in various ways.

By Senate Resolution 341, agreed to September 9, 1922 (S. J. pp. 435 and 436), the committee on crop insurance was required to report within six months after the adoption of the resolution, and was authorized to hold hearings at such times and places as it might deem advisable.

The committee on reforestation, appointed under Senate Resolution 398 of the Sixty-Seventh Congress on January 22, 1923 (S. J. pp. 105 and 106), was required to make its final report not later than April 4, 1924, and the committee was authorized to sit during the sessions or recesses of the Sixty-Seventh and Sixty-Eighth Congresses.

The committee to investigate the problem of a nine-foot channel in the waterway from the Great Lakes to the Gulf of Mexico, appointed under Senate Resolution 411, agreed to at the fourth session of the Sixty-Seventh Congress on January 25, 1923 (S. J. p. 114), was required to report not later than May 1, 1924, and authorized to sit during the ses-

sions or recesses of the Sixty-Seventh and Sixty-Eighth Congresses.

The Senate commission of gold and silver inquiry, appointed under Senate Resolution 469, agreed to at the fourth session of the Sixty-Seventh Congress on March 3, 1923 (S. J. p. 219), was authorized to sit during the sessions, recesses, or adjournments of the Sixty-Seventh and Sixty-Eighth Congresses.

The committee to investigate the Bureau of Internal Revenue, appointed under Senate Resolution 168, agreed to at the first session of the Sixty-Eighth Congress on March 12, 1924 (S. J. p. 203), was authorized to sit during the sessions and recesses of the Sixty-Eighth Congress.

The committee to investigate the activities of the War Finance Corporation, appointed under Senate Resolution 208 and agreed to at the first session of the Sixty-Eighth Congress on June 7, 1924 (S. J. p. 471), was authorized to sit during the sessions and recesses of the Sixty-Eighth Congress.

The petitioners have offered in evidence certain resolutions:

Senate Resolution 352, agreed to at the second session of the Sixty-Eighth Congress on March 3, 1925 (S. J. p. 276), continued in full force and effect during the Sixty-Ninth Congress the committee, above referred to, to investigate the problem of a nine-foot channel in the waterway from the Great Lakes to the Gulf of Mexico.

Senate Resolution 333, agreed to at the second session of the Sixty-Eighth Congress, on February 26, 1925 (S. J. p. 245), authorized the committee to investigate the Bureau of Internal Revenue, above referred to, to continue its work after March 4, 1925.

Senate Resolution 162, agreed to at the first session of the Sixty-Ninth Congress, on March 11, 1926 (S. J. pp. 222, 223), authorized a committee of five to investigate the flexible provisions of the Tariff Act of 1922 (42 Stat. 858), and directed the committee to promptly report its proceedings to the Senate.

Senate Resolutions 357 and 358, agreed to at the second session of the Sixty-Ninth Congress (S. J. pp. 157, 187) continued in full force and effect the authority of the above committee until the end of the first session of the Seventieth Congress.

Senate Resolution 147, agreed to at the first session of the Sixty-Eighth Congress on February 7, 1924 (S. J. p. 138), authorized the committee on public lands to investigate the leases of the Department of the Interior upon naval oil reserves, and authorized the committee to sit and perform its duties at

such times and places as it deemed necessary, and was followed on March 1, 1924, at the first session of the Sixty-Eighth Congress by Senate Resolution 157 (S. J. p. 182), authorizing the appointment of a committee of five to investigate the administration of the Department of Justice by Attorney General Harry M. Daugherty, and authorizing the committee to sit during the sessions or recesses of the Senate.

Senate Resolution 189, agreed to at the first session of the Sixty-Eighth Congress on March 14, 1924 (S. J. p. 207), authorized the committee created by above Resolution 157 to sit and perform its duties "at such times and places as may be deemed advisable or necessary by said committee."

The two latter resolutions were under consideration by the Supreme Court in the case of McGrain v. Daugherty, 273 U. S. 135, 47 S. Ct. 319, 71 L. Ed. 580. The petitioners rely upon the language of Mr. Justice Van Devanter in that case, in passing upon the question whether the case had become moot when the opinion was rendered on January 17, 1927. The case came before the Supreme Court upon an appeal from the final order in a habeas corpus proceeding discharging Mally S. Dougherty, who was held in the custody of the sergeant at arms of the United States Senate under process of attachment issued from the Senate in the course of an investigation being conducted by the Senate through the select committee. The respondent having failed to appear in answer to subpœnas, the President of the Senate pro tempore by authority of the Senate issued a warrant commanding the sergeant at arms or his deputy to arrest the respondent and bring him before the bar of the Senate, to answer such questions pertinent to the matter under inquiry as the Senate might order the President of the Senate pro tempore to propound. Mr. Justice Van Devanter's language is as follows:

"Another question has arisen which should be noticed. It is whether the case has become moot. The investigation was ordered and the committee appointed during the Sixty-Eighth Congress. That Congress expired March 4, 1925. The resolution ordering the investigation in terms limited the committee's authority to the period of the Sixty-Eighth Congress; but this apparently was changed by a later and amendatory resolution authorizing the committee to sit at such times and places as it might deem advisable or necessary. It is said in Jefferson's Manual: 'Neither house can continue any portion of itself in any parliamentary function

beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose.' But the context shows that the reference is to the two houses of Parliament when adjourned by prorogation or dissolution by the king. The rule may be the same with the House of Representatives, whose members are all elected for the period of a single Congress; but it cannot well be the same with the Senate, which is a continuing body, whose members are elected for a term of six years, and so divided into classes that the seats of one-third only become vacant at the end of each Congress; two-thirds always continuing into the next Congress, save as vacancies may occur through death or resignation.

"Mr. Hinds, in his collection of precedents, says: 'The Senate, as a continuing body, may continue its committees through the recess following the expiration of a Congress.' And, after quoting the above statement from Jefferson's Manual, he says: 'The Senate, however, being a continuing body, gives authority to its committees during the recess after the expiration of a Congress.' So far as we are advised, the select committee having this investigation in charge has neither made a final report nor been discharged; nor has it been continued by an affirmative order. Apparently its activities have been suspended pending the decision of this case. But, be this as it may, it is certain that the committee may be continued or revived now by motion to that effect, and, if continued or revived, will have all its original powers. This being so, and the Senate being a continuing body, the case cannot be said to have become moot in the ordinary sense. The situation is measurably like that in Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 514, 516, 55 L. Ed. 310, 31 S. Ct. 279, where it was held that a suit to enjoin the enforcement of an order of the Interstate Commerce Commission did not become moot through the expiration of the order, where it was capable of repetition by the commission and was a matter of public interest. Our judgment may yet be carried into effect, and the investigation proceeded with from the point at which it apparently was interrupted by reason of the habeas corpus proceedings. In these circumstances we think a judgment should be rendered as was done in the case cited."

The situation in the instant case is not on all fours with that in McGrain v. Dougherty. The process in that case indisputably came from the Senate, acting as such, and not through a committee. The District Court had discharged the relator, mainly upon the ground that the Senate had in contemplation the possibility of taking action other than legislation as an outcome of the investigation, and was therefore exercising a judicial function, not conferred upon the Senate. Mr. Justice Van Devanter construed the language, authorizing the committee to sit at such times and places as it might deem advisable or necessary, as apparently changing the terms of the original resolution ordering the investigation and appointing the committee. His conclusion that the question of the validity of the attachment for contempt was not moot, however, was not said to be for that reason, but because the committee might, at all events, be continued or revived by motion to that effect, if the Senate should conclude to continue the inquiry through that committee.

It is contended by the respondents that the series of resolutions offered in evidence show that the authorization to sit at such times and places as a committee deems it necessary or advisable does not relate to the life of the committee, but merely gives it authority, until the end of the session, or until, by the terms of the resolution, its time to report has expired, to hold its sessions when and where it may be deemed necessary or advisable, without regard to the duty of its members to be present at the sessions of the Senate. It is contended that this is shown by the fact that the Senate has discontinued its former practice, continued for many years, of coupling by general resolution the continuance of the functioning of its special committees and regular standing committees and that the practice indicates that the scope of the committee's activities ends at the adjournment of the senate, unless it is expressly authorized to sit and act during recesses or adjournment.

It appears, so far as the evidence introduced here is concerned, that Senate Resolution 147 of the Sixty-Eighth Congress, for investigation of Interior Department contracts on oil reserves, was the first instance in which the committee was authorized "to sit and perform its duties at such times and places as it deems necessary or proper," and that Senate Resolution 189, adopted at the same Congress, and which was considered by the Supreme Court in McGrain v. Dougherty, followed in substance the language used in Senate Resolution 147.

It does not appear whether the precedents offered to establish the practice of the Sen-

ate were or were not considered by the Supreme Court in the McGrain v. Dougherty Case. In that case the Senate, and not the committee, had ordered its process issued, and its sergeant at arms to execute the same, to bring Mally S. Dougherty before the bar of the Senate, to answer such questions as the Senate might order its presiding officer to propound, and to keep him in custody to await the further order of the Senate. The proceeding was upon a writ of habeas corpus. The writ of habeas corpus is a writ guaranteed by the Constitution for the purpose of inquiring into the cause of restraint of liberty. That is a judicial function. Both the Supreme Court and the District Courts have power to issue the writ, and, if an unlawful restraint is found, to discharge the relator from custody. The right to have the writ issued is a constitutional right. Therefore in habeas corpus cases, and in other cases in which the courts are given jurisdiction under the Constitution and laws passed by Congress to determine questions of life, liberty, or property between the individual and one depriving him of those rights, a court having jurisdiction may determine whether the authority claimed by virtue of the constitutional powers of the Senate exists, and it may pass upon those powers and determine the rights of the parties.

In the instant case, the petitioners come into court alleging that they are a committee continuing in existence after the session of Congress at which they were appointed, and asserting that they have delegated to them the power of the Senate; that the exercise of that power has been denied them by the sergeant at arms, the officer of the Senate who was directed to carry out their orders for the subpœnaing of witnesses and the taking of possession of books, papers, and ballot boxes. If their resulting situation had arisen while the Senate was in session, the question of their authority to act and to have the sergeant at arms comply with their orders, would be determined by the Senate itself. Whether or not, if a remedy through the courts be open to them, it would be by proceeding in a court having jurisdiction over the person of the sergeant at arms, has not been considered or suggested by either party. The petitioners have brought their suit in the court within the jurisdiction in which the ballot boxes and election paraphernalia are held, and are asking this court to decide a question which they would, no doubt, have had recourse to the Senate to decide, if the Senate were in session, and it

would not have occurred to any one to invoke the aid of a court, if it were not that the Senate has adjourned.

In order to establish the right claimed, it is incumbent, therefore, upon the petitioners to establish the fact that they were at the time suit was brought, and are now, a de jure committee of the Senate, having all the power conferred upon them by Senate Resolution 324. That power is disputed, and this court is asked to determine, from the evidence supplied by former resolutions of the Senate and consideration of the resolution under which the petitioners claim to act, together with the resolution referring the election contest to the standing committee on privileges and elections, that the rule established by the precedents and practice of the Senate has been and is to continue its special committees after adjournment, wherever the language used is such as is contained in Resolution 195. Nevertheless, Senator Reed, the chairman of the committee, offered, during the closing days of the session, Senate Resolution 364 for the purpose of continuing the existence of the committee after adjournment, and the members of the committee are here in court because the Senate failed to act upon that resolution. It is the very foundation of the suit, if the suit is to be maintained, that the court must determine the effect of the resolution of the Senate under which the committee claims to act, in view of the precedents and practice of the Senate, because, if the committee has the authority it claims, it must be because they have that right under the authority and sanction of the Senate itself.

It is established that the Senate may and does delegate such power as is claimed to its committees; that it did give power to the committee in this case. But has it given the power to continue to function after the adjournment? We must meet squarely, then, the question whether the court has power under the Constitution or the laws to determine this fundamental question.

[4] It is provided in the Constitution (article 1, § 5, subd. 2) that "each house may determine the rules of its proceedings." The reference of investigations instituted by the Senate to committees, the regulation of the mode and manner of the procedure of its committees, and of the times when and places where the committee shall perform its duties and exercise its powers, are a part of the determination of the rules of proceedings under which the functions of the Senate, in judging under the Constitution the election, returns, and qualifications of its members, are

performed, and the mode and manner in which the powers delegated for those purposes to the committee are to be exercised, is for the determination of the Senate alone, whether it determines them by its standing rules or in accordance with its practice established by precedent. It cannot reasonably be contended that, where the Constitution uses the term "rules of its proceedings," the words were used in the narrow sense of such standing rules as the Senate may from time to time adopt, or that the effect of its resolutions and the mode and manner of determining their effect is to be determined by the courts in case individual members of the Senate shall disagree, or in case a committee not having immediate access to the Senate as a sitting body may desire to have them interpreted.

The Constitution divides the powers of the government which it establishes into the three departments, the executive, the legislative, and the judicial, and no unlimited power is conferred on any department or officer of the government. The judicial power is vested in the Supreme Court and such inferior courts as the Congress may from time to time ordain and establish. The District Courts, being created by Congress, derive their power exclusively from Congress, through such legislation as it may see fit from time to time to enact, and it cannot confer any power upon a court, unless the authority to confer such power is found in the Constitution. The power to determine the rules of the Senate proceedings is conferred upon the Senate alone, but in cases or controversies such, for instance, as habeas corpus proceedings, in which the constitutional power is conferred upon the court, the court, in exercising that constitutional power, may, in determining the rights of the parties, construe the rules of the proceedings of the Senate, in order to determine whether the Senate has exceeded its constitutional or statutory powers.

In the proceeding now before the court, which concerns entirely the power and authority of a committee to act for the Senate, the Senate may or may not agree with the conclusions of the court. If it does, it will not be because it is bound by the judgment of the court, but because of its constitutional right to determine under its rules of proceedings whether or not the committee it once authorized to act for it has continuing power to act under that authority. When a court assumes to give its judgment as such, it must be in the exercise of judicial functions and powers which are reposed solely in the court as part of the judicial branch of the government, and which will be effective and final, subject only to review by a higher court, and not subject to be rendered ineffective through the exercise of powers conferred by the Constitution upon either the executive or legislative branch of the government. It is not, therefore, within the power of the Congress to confer upon the District Courts jurisdiction to determine the authority of a committee claiming to act under authority of the power of the Senate through section 24 of the Judicial Code, under which the petitioners assert that this court has jurisdiction.

In Hayburn's Case, 2 Dall. 409, 1 L. Ed. 436, cited and followed in Muskrat v. United States, 219 U. S. 346, 31 S. Ct. 250, 55 L. Ed. 246, the court unanimously agreed:

"That by the Constitution of the United States the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either.

"That neither the legislative nor the executive branches can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial manner.

"That the duties assigned to the Circuit Courts, by this act, are not of that description, and that the act itself does not appear to contemplate them as such, inasmuch as it subjects the decisions of these courts, made pursuant to those duties, first to the consideration and suspension of the Secretary of War, and then to the revision of the Legislature; whereas, by the Constitution, neither the Secretary of War, nor any other executive officer, nor even the Legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court."

See, also, United States v. Ferreira, 13 How. 40, 14 L. Ed. 42; Gordon v. United States, 117 U. S. 697, appendix; In re Sanborn, 148 U. S. 222, 13 S. Ct. 577, 37 L. Ed. 429.

In the case of Muskrat v. United States the court commented upon the Ferreira Case as follows:

"In the Ferreira Case this court determined the effect of proceedings under an act of Congress, authorizing the District Judge of the United States for the Northern District of Florida to receive and adjudicate claims for losses for which this government was responsible under the Treaty of 1819 between the United States and Spain [8 Stat. 252]; decisions in favor of claimants, to-

gether with evidence given in connection therewith, to be reported to the Secretary of the Treasury, who, being satisfied that the same were just and equitable and within the treaty, was to pay the amount thereof. It was held that an award of the District Judge under that act was not the judgment of a court, and did not afford a basis of appeal to this court."

In Ex parte Gans (D. C.) 17 F. 471, a petition was filed under the Act of June 22, 1874, providing for the determination by the court of the value of the services of an informer in smuggling cases. Section 6 of the act (18 Stat. 187) provided that no payment, where judicial proceedings shall have been instituted, shall be made to the informer until the compensation shall have been established to the satisfaction of the court or judge having cognizance of such proceedings, and the value of his services been duly certified by said court or judge for the information of the secretary of the treasury; but no certificate of the value of such services shall be conclusive of the amount thereof.

Judge Treat said: "As section 4 [Comp. St. § 5798] gives to the Secretary of the Treasury the sole discretion as to the sum to be awarded to an informer, it is obvious that no judicial action can properly be had with respect thereto; for, when a judicial decision is had, it must be final, unless reversed or modified by the appropriate court having appellate or revisory jurisdiction. There is no appeal from a decree of the court to any executive officer, nor can there be consistently with the elementary principles on which the government rests. The co-ordinate authority of the executive, legislative, and judicial departments must be observed, each of which departments is confined in its action to the sphere assigned to it."

See, also, following and approving the Gans Case, Ex parte Riebeling (D. C.) 70 F. 310; also the opinion of Judge McPherson, of this court, in United States v. Queen, 105 F. 269.

Inasmuch as the case of the petitioners is based upon the determination of the authority conferred upon them by the Senate of the United States under the rules of its proceedings, and the determination of that question is, under the Constitution, conferred upon the Senate alone, my conclusion is that the case depends upon the determination, not of a judicial, but of a legislative, question; that no finding by this court that the Senate has continued under its proceedings the life of the committee authorized by Senate Resolutions 195 and 324 beyond the end of the session of the Sixty-Ninth Congress, would be final, and therefore a decree, based thereon, would not be a decree which would be final, unless modified or reversed by a court having appellate jurisdiction, but would be subject to the determination of the Senate of the rules of its proceedings. It follows that section 24 of the Judicial Code cannot be constitutionally construed as having conferred that power upon the court, as claimed by the petitioners.

It is therefore ordered that the bill be dismissed for want of jurisdiction.